**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0057-14T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ANGEL T. TORRES, a/k/a
ANGEL D. RAMOS, and
ANGEL RAMOS,

      Defendant-Appellant.

_____

> Argued February 5, 2018 – Decided January 25, 2019
>
> Before Judges Accurso, O'Connor and Vernoia.
>
> On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 10-03-0333 and 10-03-0340.
>
> Joseph A. Fischetti, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robert J. Kipnees, Designated Counsel, and Joseph A. Fischetti, on the briefs).
>
> Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Andrew C. Carey, Middlesex

County Prosecutor, attorney; Nancy A. Hulett, of
counsel and on the brief).

The opinion of the court was delivered by

O'CONNOR, J.A.D.

Defendant Angel T. Torres was convicted by a jury of first-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), of A.V.[1]; second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), of L.D.; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:58-4. In a bifurcated trial, the same jury also convicted defendant of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b); this charge arose out of a separate indictment. In the aggregate, defendant was sentenced to a twenty-four year term of imprisonment.

Based upon our review of the record and applicable legal principles, we affirm defendant's convictions, but remand for resentencing.

I

We recount the evidence adduced at trial relevant to the issues on appeal. On August 18, 2009, defendant was informed his seventeen-year old son, Angel

---

[1] We use initials to protect the victims' identities.

A-0057-14T2

Diaz, had been assaulted by L.V, an adult. One of Angel's[2] friends, co-defendant Axcel Diaz[3], testified that he, Angel, defendant, and two others got into a white car to go to L.V.'s home. When he entered the car, defendant was wearing a hat. According to Axcel, a black vehicle with "many people" in it accompanied them to L.V.'s home, which was a building in which three families lived in three separate living quarters.

When the cars stopped in front of L.V.'s home, defendant stated, "get the man who's responsible." Defendant also told Axcel, whose parents lived in the same building as L.V., to get his parents into the basement. After he was inside the house, Axcel heard the sound of shattering glass followed by gunshots. Axcel observed that A.V. and L.D., two residents in the building, had been hit by bullets. Axcel testified "they" had fired shots through the door; it is not disputed the front door had six bullet holes in it. A.V. died from his gunshot wounds and L.D. survived.

---

[2] Because some of those involved in the events of that day share the same surname, we refer to them by their forenames in order to avoid confusion. We intend no disrespect by this informality.

[3] Before defendant's trial, Axcel Diaz pled guilty to two counts of hindering apprehension of another, N.J.S.A. 2C:29-3(a).

A-0057-14T2

One of the residents in the building, Angel Alvarado, testified he saw a black and a white vehicle pull up and stop. Axcel emerged from the white car, ran up to the house, and told his parents to get into the basement. Axcel also told Alvarado that he should "duck." When Alvarado asked for clarification, Axcel said, "it's already too late." L.K. testified he heard another resident in the building say that "he" had a gun. L.K. ran toward his living area in the building and, while doing so, observed A.V. struggling to keep the front door shut. L.K. then heard gunshots.

Another resident, Beatriz Rodriguez, testified she was standing on the front porch of the building when she saw a black and a white vehicle pull up and noticed two men approach the building. One was young and the other was "older." The older one, who she estimated was five feet tall, was wearing a hat and carrying a stick the size of a baseball ball. He slapped Rodriguez in the face as he passed her; she commented that, at that moment, the two were "face-to-face" and she was able to look directly at him.

He then smashed the glass on the outer, storm door of the building with the stick. The other man tried to kick in the front door. Meanwhile, Rodriguez ran across the street. She heard gunshots, but did not see who the shooter was. She saw one of the men run back to the white car and the other to the black car,

4

and both vehicles drove off. There was evidence that, when arrested, defendant's height was determined to be five feet and one inch.

A few days after the incident, Rodriguez viewed photographs at a photo line-up. One of the photographs was of defendant and she stated the person in that particular photograph "jump[ed] out at her," but she was unable to definitively identify the person in the picture as defendant. She later saw a picture of defendant in a newspaper and notified the Prosecutor's Office the person in the picture was the man who slapped her at the crime scene. When she testified in court, Rodriguez pointed to defendant at counsel table and stated she was eighty percent sure he was the person who slapped her.

Before trial, defendant sought to preclude the admission of what transpired during the photo line-up. After a Wade[4] hearing, the trial court denied defendant's motion. We detail the evidence adduced during the Wade hearing when we address the issues defendant asserts concerning the denial of his motion.

As noted, the jury convicted defendant of the reckless manslaughter of A.V., the aggravated assault of L.D., and related gun offenses. He was acquitted of the following offenses: A.V's murder, N.J.S.A. 2C:11-3(a)(1), (2), L.V.'s

---

[4] United States v. Wade, 388 U.S. 218 (1967).

attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1), (2), and conspiracy to commit L.V.'s murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1), (2).

II

On appeal, defendant raises the following points for our consideration.

POINT I: THE TRIAL COURT ERRED BY ALLOWING THE JURY TO CONSIDER AN UNCHARGED CRIME, RECKLESS MANSLAUGHTER, WHEN THE EVIDENCE BELOW DID NOT SUPPORT OR SUGGEST A CONVICTION UNDER THAT INCLUDED OFFENSE. (NOT RAISED BELOW).

POINT II: THE TRIAL COURT ERRED BY DISCHARGING THE JURY AND THEN REASSEMBLING IT FOR THE PURPOSE OF RENDERING A VERDICT ON THE COUNT FOR CERTAIN PERSONS NOT TO POSSESS A WEAPON. (NOT RAISED BELOW).

POINT III: THE TESTIMONY OF BEATRI[Z] RODRIGUEZ, INCLUDING HER UNFAIRLY PREJUDICIAL IDENTIFICATION OF [DEFENDANT] AS A MEMBER OF THE LATIN KINGS AND HER EYEWITNESS IDENTIFICATION OF [DEFENDANT], PRECLUDED A FAIR TRIAL.

A. THE TRIAL COURT ERRONEOUSLY ADMITTED EVIDENCE OF BEATRI[Z] RODRIGUEZ'S IMPROPERLY ADMINISTERED PHOTO ARRAY IDENTIFICATION AND ALLOWED TAINTED IN-COURT TESTIMONY IDENTIFYING [DEFENDANT].

6

1. THE TRIAL COURT ERRED BY FINDING THAT THE PHOTO ARRAY IDENTIFICATION WAS COMPLIANT WITH THE STANDARDS SET FORTH IN STATE V. HENDERSON.

2. IN THE ALTERNATIVE, EVEN IF STATE V. HENDERSON IS NOT APPLICABLE, THE PHOTO ARRAY WAS INADMISSIBLE UNDER STATE V. MADISON. (NOT RAISED BELOW).

B. THE TRIAL COURT ERRED BY REFUSING TO DECLARE A MISTRIAL FOLLOWING BEATRI[Z] RODRIGUEZ'S TESTIMONY REGARDING A HEARSAY STATEMENT IDENTIFYING [DEFENDANT] AS A MEMBER OF THE LATIN KINGS.

POINT IV: THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

A. THE TRIAL COURT ERRED BY FINDING THAT NO MITIGATING FACTORS APPLIED.

B. THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES FOR RECKLESS MANSLAUGHTER AND AGGRAVATED ASSAULT.

A

For the first time on appeal, defendant contends the trial court erred when it instructed the jury to consider the lesser-included offense of reckless manslaughter to the charge of murder. Defendant asserts the evidence revealed the shooter deliberately fired six shots into the front door of L.V.'s home, behind

7

which people had just retreated. Defendant reasons such acts were indicative of an intent to kill and, thus, cannot be consistent with acting recklessly.

During the charge conference, the court announced it would be charging "on some lesser included offenses, particularly on the murder charge" and asked if either party had an objection. Defense counsel answered in the negative. Because there was no objection to the charge, our review requires we apply the "plain error" rule. R. 2:10-2; State v. Montalvo, 229 N.J. 300, 320-21 (2017). Plain error in this context means there existed a "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Burns, 192 N.J. 312, 341 (2007) (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

Our Supreme Court has held that "a trial court has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." State v. Thomas, 187 N.J. 119, 132 (2006) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)); see State v. Denofa, 187 N.J. 24, 41-42 (2006). The rationale for imposing such an obligation on the trial court is that

"[n]o defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense that is clearly indicated in the record."  State v. Garron, 177 N.J. 147, 180 (2003).  The danger of prejudice to a defendant that may result from a trial court's failure to charge a lesser-included offense to the jury is that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction."  State v. Sloane, 111 N.J. 293, 299 (1988) (quoting Keeble v. United States, 412 U.S. 205, 212-13 (1973)).

Reckless manslaughter is a lesser-included offense of murder.  State v. Ramsey, 415 N.J. Super. 257, 263-64 (App. Div. 2010).  Criminal homicide constitutes reckless manslaughter under N.J.S.A. 2C:11-4(b)(1) when "[i]t is committed recklessly[.]"  An actor is reckless:

> when he consciously disregards a substantial and unjustifiable risk  that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
>
> [N.J.S.A. 2C:2-2(b)(3).]

9

To convict a defendant of reckless manslaughter in violation of N.J.S.A. 2C:11-4(b), the State "need not prove that the defendant perceived a risk that the victim would certainly or probably die as a result of the defendant's conduct; the defendant has the required state of mind if he 'disregarded only a "possibility" of death[.]'" State v. Campfield, 213 N.J. 218, 233 (2013) (alteration in original) (quoting Jenkins, 178 N.J. at 363 (2004)).

Here, the court had a rational basis to charge reckless manslaughter. It is not known whether it was defendant or his accomplice - the man who was observed trying to kick down the front door after defendant smashed the storm door - who fired the six shots through the door. But the absence of evidence identifying who actually fired the gun at the door is inconsequential, because defendant was charged with accomplice liability. See N.J.S.A. 2C:2-6; State ex rel. Atlantic Cty. Prosecutor v. City of Atlantic City, 379 N.J. Super. 515, 521 (App. Div. 2005).

In our view, it is patently obvious that, by shooting at the door when defendant or his accomplice knew there were people inside – in fact, A.V. was pressing against the front door in an effort to keep defendant and his accomplice from entering - the actor consciously disregarded a substantial and unjustifiable risk that those behind the door would be injured or killed. The risk was of such

A-0057-14T2

a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard was a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.  See N.J.S.A. 2C:2-2(b)(3).  Further discussion on the question whether firing a gun at the door under these circumstances constituted recklessness as defined by N.J.S.A. 2C:2-2(b)(3) is unnecessary.  We discern no plain error warranting reversal because the jury was instructed on the lesser-included offense of reckless manslaughter.

B

The court discharged the jury following the jury's announcement of its guilty verdicts on the reckless manslaughter, aggravated assault, and weapons offenses, and not guilty verdicts on the murder, attempted murder, and conspiracy to commit murder charges.  After the jury left the courtroom, the court immediately realized the jury had not considered the charge of certain persons not to have weapons (certain persons).  The jury was to consider this charge in a bifurcated trial after it had reached a verdict on all other charges, in accordance with State v. Ragland, 105 N.J. 189 (1986).

The court asked the staff to bring the jury back into the courtroom and, when it arrived, the trial on the certain persons charge commenced.  Defendant

11

argues it was reversible error for the trial court to permit the jury to consider this charge after it had been discharged. He contends that during the period the jury was discharged, any juror could have been exposed to information that improperly influenced him or her.

Defendant did not provide a copy of the court clerk's log but, as revealed by the transcript of what transpired in the courtroom from the moment the jury was excused to the time it was returned to the courtroom, only a very limited amount of time elapsed. Specifically, after the court excused the jury, there was brief colloquy between the court and counsel, and the jury then re-entered the courtroom. The transcript demonstrates as follows:

> THE COURT: [Addressing the jury] Thank you for your service. . . . And I will excuse you at this time.
>
> (The following is out of the presence of the jury.)
>
> THE COURT: There remains a count in the [other] indictment, Indictment 10-03-340, certain persons not to have a weapon. Mr. [Prosecutor], what is your preference on how to proceed?
>
> PROSECUTOR: I'd like to proceed on that count, your Honor.
>
> THE COURT: [Defense counsel]?
>
> DEFENSE COUNSEL: Well, I object. I have no reason, but I do.

12

PROSECUTOR: The jury's just been discharged, Judge.

THE COURT: Well, they're still on the floor. At this point, I assume you're just going to submit?

PROSECUTOR: Yes, your Honor. I assume [defense counsel] does not want the jury to see the indictment. I ask that there be a stipulation that there's a conviction and then I'll open –

THE COURT: All right.

PROSECUTOR: -- present the indictment and close.

THE COURT: You wish to proceed?

DEFENSE COUNSEL: Yes

THE COURT: All right. Yeah. Tell them he's going to have to bring the jury back.

CALENDAR COORDINATOR: They'll just be a moment, Judge.

SHERIFF'S OFFICER: Jury entering.

The court then informed the jury it had to consider the certain persons charge. The prosecutor very briefly addressed the jury in what was both his opening and closing statement; defendant waived both statements. The court then instructed the jury on the certain persons charge.

Among other things, the court told the jury the parties stipulated defendant had been previously convicted of a crime. It further instructed the jury to

13

completely disregard its prior verdict and to consider anew the evidence previously admitted in connection with the charge for possession of a weapon. The court stated:

> On the issue of possession, although you may consider evidence previously introduced, the State must prove beyond a reasonable doubt that the defendant possessed the weapon before you find the defendant -- before you may find the defendant guilty on this charge. In deciding whether the State has carried its burden of proof, you must set aside your previous verdict and begin your deliberations anew.

Later that day, the jury found defendant guilty of the certain persons charge.

Although during the above-cited colloquy defense counsel lodged an objection to proceeding on the certain persons charge, he did not specify his objection and then admitted he had no reason to object and wished to proceed. Because there was no objection to the court permitting the jury to consider the certain persons charge, we consider whether permitting the jury to do so constituted plain error. See R. 2:10-2 (any error will be disregarded unless it was "clearly capable of producing an unjust result."). Applying that standard, we conclude there was no such error.

Defendant cites State v. Black, 380 N.J. Super. 581, 589 (App. Div. 2005), Mohan v. Exxon Corp., 307 N.J. Super. 516, 522-24 (App. Div. 1998), and State v. Fungone, 134 N.J. Super. 531, 534-36 (App. Div. 1975), in support

14

of his argument that once a jury is discharged and leaves the courtroom, it cannot be reassembled, warranting the reversal of the certain persons charge. We find these cases distinguishable.

In Black, the jury failed to render a verdict on one of the offenses with which the defendant had been charged. The court overlooked the jury's omission when the court reviewed the verdict sheet and discharged the jury. The following day, the court reconstituted the jury so that it could render a verdict on the remaining charge. The jury did so, finding defendant guilty of such charge. On appeal, defendant contended the trial court erred by recalling the jury, and argued the subject conviction had to be vacated.

We agreed with the defendant, citing Fungone and Mohan for the premise that "[o]nce a jury has been discharged and dispersed, it cannot be reassembled in order to correct an omission in the verdict, including the failure to announce a portion of the verdict agreed upon but not reported." Black, 380 N.J. Super at 589.

In Fungone, the jury found the defendant guilty of larceny. Although it had been instructed to make a finding of the value of the item stolen in the event the jury found the defendant guilty of larceny, the jury neglected to do so. The court discharged the jury before realizing the jury's oversight. The following

morning, the court reconvened the jury so that it could render a verdict on this remaining question. The jury then assigned a value to the stolen item. We found the trial court erred by reconvening the jury the following day. We stated:

> The essential factor in determining whether a discharged jury can be reassembled in order to further deliberate or report on a verdict already reached is whether it has dispersed, left the jury box or courtroom, and had an opportunity to mingle with court attendants, other jurors, or third persons. The fact that the court has announced the jury's discharge will not foreclose subsequent proceedings by the jury, if its members have remained in the jury box or otherwise within the continuous control of the court.
>
> [Id. at 535 (emphasis added) (citation omitted).]

In Mohan, the jury failed to answer two questions on the verdict sheet. Four days later, the court reconvened the jury so that it could answer such questions. We held the fact the jury was dispersed and beyond the control of court for four days compelled a finding the jury's answers to the two questions could not "serve as the basis for a resolution of the issues presented by those questions." We remanded the matter for retrial on the issues to be resolved by those questions. We noted:

> The operative element in determining when and whether a jury's functions are at an end is not when the jury is told it is discharged but when the jury is dispersed, that is, has left the jury box, the court room or the court house and is no longer under the

16

guidance, control and jurisdiction of the court. This clearly is the rule in criminal cases; there is no reason why the same rule should not apply in civil cases as well.

[Id. at 522-23].

Here, as indicated by what transpired in the courtroom after the jury left, it is evident the amount of time that elapsed before the jury was reconvened was very brief, if not fleeting. The court realized its error so quickly the jury did not even have the opportunity to leave the floor before being herded back into the courtroom by court personnel. Defendant himself was not concerned about the lapse in time and whether a juror had been tainted during the brief period the jury was discharged.

More important, when it reconvened the jury was not asked to render a verdict on the matter previously before it. The jury was asked to consider a new charge in a different, bifurcated proceeding. Further, the jury was instructed to completely disregard its prior verdict, and to deliberate and consider anew the evidence previously admitted in connection with the charge for possession of a weapon, and it is presumed the jury followed the court's instructions. See State v. Patterson, 435 N.J. Super. 498, 511 (2014) (quoting State v. Smith, 212 N.J. 365, 409 (2012)).

Under these circumstances, we discern no error that was clearly capable of producing an unjust result. Finally, because of our disposition, we need not address defendant's contention that, if the certain persons conviction were reversed, a retrial would violate his protection against double jeopardy.

C

Defendant contends the court committed reversible error when it declined to declare a mistrial after Rodriguez testified defendant was a member of the Latin Kings. We note Rodriguez did not state defendant was a member of this gang. Rodriguez testified about a fight in which L.V. and others assaulted a group of teenagers, which included Axcel and defendant's son. Rodriguez actually stated that, after the fight ended, Axcel yelled, "you guys hit a Latin King's son."

As soon as Rodriguez made this comment, the court said "stop" and defense counsel asked for a sidebar. During the sidebar conference, the court denied defense counsel's request for a mistrial, commenting, "You're assuming people know what that is, so I'm going to give them a curative instruction . . . ." Following sidebar, the court instructed the jury, "Jury's to disregard that last statement, not part of the record." During its final charge to the jury, the court told the jury:

> Any testimony that I may have had the occasion to
> strike is not evidence and should not enter into your
> deliberations. It must be disregarded by you. That
> means that even though you will remember the
> testimony you are not to use it in your discussions or
> deliberations.

A motion for a mistrial is to be granted when necessary to obviate a manifest injustice. State v. DiRienzo, 53 N.J. 360, 383 (1969). The decision to deny such a motion is within the sound discretion of the trial court, and will be reversed only if the court abused its discretion. State v. Winter, 96 N.J. 640, 647 (1984) (quoting State v. Witte, 13 N.J. 598, 611 (1953)). Defendant insists he was denied a fair trial because Rodriguez allegedly indicated defendant was a member of the "Latin Kings."

First, there was no indication Axcel's comment referred to defendant. Persons other than defendant's son were assaulted during a fight in which L.V. participated. Second, this was a lengthy trial, during which nineteen witnesses testified. Rodriguez's isolated and transitory reference to the Latin Kings did not stand out. Third, it bears noting the jury acquitted defendant of murder, indicating the prejudicial effect defendant feared the subject comment might have caused did not materialize. Accordingly, the fleeting reference to the Latin Kings, compounded mitigated by the court's swift instruction, did not warrant a mistrial.

19

D

Defendant next contends the court erred when it admitted evidence of the "improperly administered photo array identification" in which Rodriguez participated. Defendant further maintains the manner in which the photo line-up was conducted impermissibly influenced Rodriguez's in-court identification of defendant. We disagree with both contentions.

During the <u>Wade</u> hearing, the court viewed a video recording of the photo line-up proceeding, and a transcript of that recording was admitted into evidence. The video recording is not in the record, but the transcript is. The transcript reveals the following.

At the outset of the proceeding, detective Olivieri of the Woodbridge Police Department told Rodriguez he was going to show her six photographs, one at a time. Pertinent comments he made before Rodriguez viewed the photographs were that she: could take as much time as she needed to review the photographs; should not conclude "that the person is in here"; should let him know if she saw "the person"; and was "absolutely not required to pick anybody so don't feel obligated to pick anybody."

Rodriguez viewed the six photographs and, as to photograph number four, stated, "I'm not sure but I think it's this one, but I'm not sure." She looked at the

photographs again and then stated her choice was between photographs number four and five. Photograph four was in fact a picture of defendant. We note the transcriber found some portions of the detective's and Rodriguez's statements inaudible, but the parties are not disputing that after she looked at photographs four and five an additional four times, Rodriguez stated photograph number four "jumped out at" her more.

Rodriguez asked to look at the photographs again and then asked the detective whether there could be more than one person "in this pile . . . at the crime scene." The detective replied, "I don't know for sure but I would think that there is . . . when we have a photo line-up we have one target, you know[.]"[5] However, the detective subsequently told Rodriguez she should not feel pressured to "pick someone," and that "[t]he person may or may not even be in the line-up, okay."

At the end of the proceeding, the detective told Rodriguez he jotted down her findings about the photographs and, as for photograph four, wrote "jumps out of [sic] her a little more." She signed his notes, confirming that was her finding. Thereafter, Rodriguez asked the detective what would happen given she did not "pick anybody." The detective stated the investigation would

---

[5] The ellipses in this statement appear in the transcript.

continue.

At the <u>Wade</u> hearing, the detective testified that, before the photo line-up, he did not know anything about defendant except that he was male and Hispanic, had not been involved in the investigation of the crime, and had not spoken with Rodriguez before the line-up. The detective mentioned the six photographs in the array were compiled from driver's license photographs.

The trial court denied defendant's motion, but when it evaluated and decided the issues before it, the trial court applied the law in <u>State v. Henderson</u>, 208 N.J. 208 (2011). <u>Henderson</u> does not apply in this matter, because the subject incident and photo line-up occurred in 2009 and <u>Henderson</u> applies prospectively only. <u>See</u> <u>State v. Micelli</u>, 215 N.J. 284, 287 (2013). Defendant contends that under <u>State v. Madison</u>, 109 N.J. 223, 232-33 (1988), which set forth the standard to be applied before <u>Henderson</u> was issued, his motion should have been granted. We agree the two-step test articulated by the United States Supreme Court in <u>Manson v. Brathwaite, 432 U.S. 98, 114</u> (1977), and adopted by our Supreme Court in <u>Madison</u>, applies in this matter.

Under the first step of this test, a court must decide whether the procedure in question was impermissibly suggestive. "Impermissive suggestibility is to be determined by the totality of the circumstances of the identification." <u>Madison</u>,

109 N.J. at 234 (quoting State v. Farrow, 61 N.J. 434, 451 (1972)). Such a determination

> can only be reached so as to require the exclusion of the evidence where all the circumstances lead forcefully to the conclusion that the identification was not actually that of the eyewitness, but was imposed upon him [or her] so that a substantial likelihood of irreparable misidentification can be said to exist.
>
> [Ibid. (quoting Farrow, 61 N.J. at 451).]

If there is a finding the procedure was impermissibly suggestive, the court may proceed to the second step, which requires the court to determine whether the procedure resulted in a "very substantial likelihood of irreparable misidentification." Id. at 232.

Here, defendant contends the detective's statement that the police include a suspect in a photo array was impermissibly suggestive, because it suggested to Rodriguez that she had to make a selection. When viewed in context, we cannot agree this statement had the effect defendant claims.

The detective initially advised Rodriguez that she should not conclude the suspect was in the photo array, and that she was not required to "pick anybody." After viewing all of the photographs and examining photographs four and five in particular a number of times, the most Rodriguez could say was that photograph number four "jumped out" at her more. It was after she came to that

A-0057-14T2

conclusion that the detective indicated there is a target in a photo line-up. However, he then changed that statement and said "the person" may or may not be in the photo array Rodriguez was viewing, and that she should not feel pressured to choose anyone.

Therefore, even if the detective's comment that there was a target in a photo array was suggestive, he changed his statement and clarified the target may or may not have been in the array she was viewing. But more important, Rodriguez did not change her findings about any of the photographs she had viewed after the detective stated there was a target in an array. Rodriguez maintained photograph four jumped out at her more both before and after the detective's allegedly suggestive comment. There is no evidence Rodriguez's impression of photograph four were not actually hers. Accordingly, we cannot say the procedure in question was impermissibly suggestive under the totality of the circumstances. Given the first step of the <u>Madison</u> test was not met, we need not address the second.

E

Defendant was sentenced to consecutive eight-year terms of imprisonment for reckless manslaughter, aggravated assault, and certain persons not to possess a weapon, for an aggregate term of twenty-four years. The court

24

merged the convictions for possession of a weapon for an unlawful purpose and for unlawful possession of a weapon, but then it imposed a five-year term of imprisonment for each conviction, to run concurrently to all other sentences.

Defendant contends his sentence is excessive, arguing the court erred when it determined the convictions for reckless manslaughter and aggravated assault warranted consecutive sentences. He also argues the court erroneously failed to apply certain mitigating factors.

Before imposing its sentence, the court found aggravating factors N.J.S.A. 2C:44-1(a)(3) (the risk defendant will commit another offense), (6) (the extent of defendant's prior criminal record and the seriousness of the offenses of which he was convicted), and (9) (the need to deter). The court rejected defendant's argument there were grounds to apply mitigating factor seven, N.J.S.A. 2C: 2C:44-1(b)(7) (defendant led a law-abiding life for a substantial period of time before the commission of the present offense). Although not argued before the trial court, on appeal defendant argues the court should have applied mitigating factors N.J.S.A. 2C:2C:44-1(b)(3) (defendant acted under a strong provocation), and (4) (there were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense).

25

The trial court rejected defendant's argument that mitigating factor seven applied. Although defendant had not been convicted of a crime since 1993, at that time he was convicted of three counts of attempted murder, for which he received a ten-year sentence. The court found that defendant's imprisonment "had no impact on Mr. Torres. I agree with [the prosecutor], Mr. Torres' response to perceived frustration is to get a handgun and start shooting." When the court determined aggravating factors six and nine applied, the court added, "I'm struck by the fact that both in his conviction and his prior conviction, anger was apparently the fuel for the disregard of human life. His anger blinded him to the consequences, a quest for revenge that had no limits. . . . Clearly, the prior conviction did not deter [him] . . . ."

The court found the subject consecutive sentences appropriate:

> pursuant to the principles of State v. Yarbough[, 100 N.J. 627 (1985), superseded by statute, N.J.S.A. 2C:44-5]. I have different victims here, different levels of harm. The court finds that to sentence [the convictions for reckless manslaughter and aggravated assault] as concurrent will essentially give Mr. Torres a free crime, and that is not permitted under our system of justice . . . . [The] sentence [for certain persons not to have weapons] shall be consecutive to [the sentence imposed for reckless manslaughter and aggravated assault]. Again, not to sentence separately would give this defendant a free crime and would invalidate or negate the purpose of the Certain Persons not to have a weapon.

26

We defer to a court's sentencing decision unless (1) the court did not adhere to the sentencing guidelines; (2) the findings on the aggravating and mitigating factors were not based on competent, credible evidence; or (3) under the facts of the case, the sentence was "clearly unreasonable so as to shock the judicial conscience." State v. Roth, 95 N.J. 334, 364-65 (1984). Generally, if a sentencing court does not explain its reasoning for imposing consecutive sentences pursuant to Yarbough, a remand is necessary. State v. Miller, 205 N.J. 109, 129 (2011). However, a reviewing court can affirm a sentence where it is "possible to 'readily deduce' the judge's reasoning." Id. at 129-30 (quoting State v. Bieniek, 200 N.J. 601, 609 (2010)).

Here, it is clear from the record the court properly weighed and considered the relevant aggravating and mitigating factors based on competent and credible evidence in the record. Further, although its comments were brief, the court sufficiently articulated its reasons for imposing consecutive sentences under Yarbough. Additional comment about the trial court's findings with respect to the applicable aggravating and mitigating factors and its decision to impose the consecutive sentencing it ordered is unnecessary.

However, we note the judgment of conviction states defendant was convicted of first-degree reckless manslaughter. As a matter of law, this crime

27

is a second-degree offense.  <u>Campfield</u>, 213 N.J. at 232.  It is not completely clear from the record whether, when it sentenced defendant for this conviction, the court considered this to be a first- or second-degree offense.  The fact the court sentenced defendant within the second-degree sentencing range, <u>see</u> N.J.S.A. 2C:43-6(a)(2) (establishing the sentencing range for second-degree offenses between five years and ten years), suggests it was mindful reckless manslaughter is a second-degree offense.  But to ensure none of the trial court's sentencing decisions was influenced by an erroneous assumption that reckless manslaughter is a first-degree crime, we are remanding this matter so the court may review the sentence it imposed for all convictions and, if necessary, re-sentence defendant, accordingly.

In addition, because the court erred by imposing a sentence on each of the two merged convictions, we remand and direct the trial court to correct the sentence and amend the judgment of conviction.  The sentence is defective because fines and penalties were imposed on both counts when they had been merged into one.

To the extent we have not expressly addressed an argument defendant asserted on any issue in his brief, it is because such argument was without sufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(2).

Affirmed in part and remanded in part for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0057-14T2